Jimmy T. SMITH, an Individual and Smith Sales Co., a Corporation, Plaintiffs-Appellants,

v.

SCRIVNER–BOOGAART, INC., a Corporation, Defendant-Appellee.

No. 322–70.

United States Court of Appeals, Tenth Circuit.

June 21, 1971.

Rehearing Denied Oct. 22, 1971.

Stan P. Doyle, and Richard E. Hancock, Tulsa, Okl., for plaintiffs-appellants.

Jack R. Givens, Tulsa, Okl., for defendant-appellee.

Before CLARK*, Associate Justice, and SETH and HOLLOWAY, Circuit Judges.

CLARK, Associate Justice.

This appeal seeks to overturn a jury verdict in an antitrust suit involving alleged violations of Section 1 of the Sherman Act and Sections 3 and 16 of the Clayton Act. Specifically, Jimmy T. Smith and Smith Sales Company, a corporation, appellants, wholesalers of automotive accessories, chemicals, etc. claim that Scrivner-Boogaart, Inc., a corporation, appellee, a wholesale-retail grocer and manufacturer is guilty of a *per se* violation of the antitrust laws in that it exacted agreements from appellants requiring them to purchase so much of appellants' merchandise requirements for re-sale as shall equal in dollar volume 65 percent of their monthly sales; that, in any event, the agreements were an unreasonable restraint of trade or commerce under § 1 of the Sherman Act; that the form of the verdict as submitted to the jury was erroneous in that it called solely for the legal conclusion of the jury as to whether appellee violated the antitrust laws of the United States; and, finally, that the rulings of the trial judge excluding certain evidence as to damages were erroneous and his refusal to instruct that the agreements were a *per se* violation of the antitrust laws was invalid. We have carefully studied the entire record and have been unable to find support for appellants' claims as to violations of the antitrust laws and therefore affirm the judgment without reaching the issue of damages.

## I.

*Background of the Parties and the Market:*

The appellants began business in 1965 in Oklahoma in the wholesaling of a line of about 400 items of automotive accessories, automobile additives, chemicals, major brands of motor oil, oil filters, tools, charcoal, charcoal lighters and sunglasses. Appellants serviced the Tulsa area, primarily, with some sales in Picher and Oklahoma City, Oklahoma. Their customers included service stations, automobile garages, discount houses and retail grocery concerns. The latter made up 65 percent to 75 percent of their total sales, which in 1966 were $119,000, but by 1969 had reached $447,000 with gross profits of $56,519. Appellant's largest customer was Warehouse Markets, a chain of 15 stores, with gross purchases from appellants of $226,650 in 1969. Red Bud Stores was their number two customer with $23,017 in 1969 although the appellee was its primary supplier. Appellants contend that this wide disparity in its sales to Warehouse Markets and Red Bud is due to an illegal tying and exclusive dealing arrangement between Red Bud and appellee. However, Red Bud only stocked 1 percent of their total inventory in the automotive and accessory line.

The appellee is an integrated manufacturing and wholesale-retail concern that handles some 8000 items in the grocery and affiliated lines. Fourteen of these are in the automobile accessory line which is in competition with appellants. While the record does not show the amount of sales of appellee in the automobile accessory line, we do know that its total sales in all 8000 items approximates $110,000,000 annually to some 120 stores in Oklahoma, Texas, Arkansas, Nebraska and South Dakota. Some $60 million of this total is sold in Oklahoma. The relevant market in which appellant operates is Tulsa and its vicinity where there are over 400 retail grocery establishments, out of which the appellee serves ten. The appellee services most of its customers in the usual wholesale-retail manner; however it serves 25 of its outlets in Oklahoma under a sub-lease agreement. Four of these are in the Tulsa area where the

---

* Associate Justice, United States Supreme Court, Retired, sitting by designation.

appellee also owns 4 stores either in whole or in part and serves two other stores in the traditional manner.

## II.

*The Sub-Lease Agreements:*

These contracts are in the customary form for leases of retail stores premises. However the form includes a standard clause [1] that requires the retailer to purchase from the appellee 65 percent of the retailer's total monthly net sales and to participate in certain dealer services rendered by appellee. When the usual 20 percent mark up on groceries and the necessity for goods other than those sold by appellee are considered the effect of this requirement is that a sub-lessee is forced to purchase about 80 percent of his requirements from appellee.

In addition, the required services include a complete accounting system, an advertising program, central billing and store remittance services, etc. furnished by appellee at additional fees. Under the advertising program the independent retail managers of the sub-lessee stores meet at regular intervals to agree on what items will be placed in media advertising and the price that will be charged for each item.

Appellants contend that the appellee is able to exact these restrictive terms from sub-lessees by agreeing to finance the opening of new stores, contracting for fixtures, furnishing a line of credit, providing the initial stocking of merchandise and making premises available, all on a reimbursable basis. While there are other wholesale grocers who perform similar services to consenting retailers

frequently the merchant is unable to obtain financing without such terms. In the event a sub-lessee fails to perform the conditions of the lease the appellee then cancels it and forecloses. The record indicates one such instance being so handled. Another witness testified that she had been required to abide by the sub-lease requirements.

Appellant claims damages of $10,000 for loss of profits that they would have enjoyed from sales to appellee's sub-lessees but for the violations of the antitrust laws. They also claim specific damage of $884.01 which is the balance due them on an open account by a sub-lessee of appellee whom the latter had foreclosed and forced into insolvency. The jury returned a verdict for the appellee.

## III.

*Appellant's Contentions:*

1. Appellant says that the sub-lease arrangement of the appellees is a *per se* violation of Section 1 of the Sherman Act under the rule of Fortner Enterprises, Inc. v. United States Steel Corporation, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) and cases there cited. The Supreme Court has held that tying arrangements—the sale of one product conditioned upon the purchase of another—are illegal and that violations are *per se* provided a market leverage or control is present in the tying product and the market foreclosed is not *de minimis*. In *Fortner*, supra, the Court held that financial arrangements such as cash, credit, etc. may be the tying product and that sufficient dominance or economic control was present in

---

1. "SERVICES AND REQUIREMENTS
"Sub-Lessee shall participate in all dealer services and programs provided by Sub-Lessor, including, but not limited to, store accounting service, Red Bud advertising, frozen food plan, sign rental and store remittance service. During the term of this Sub-Lease Contract. * * * Sub-Lessee shall purchase from Sub-Lessor, each month, so much of Sub-Lessee's merchandise

requirements, including dry groceries, health and beauty aids, frozen foods, fresh produce, fresh and cured meats and other items purchased for resale, as shall equal, in dollar volume, sixty-five percent (65%) of Sub-Lessee's total monthly net sales. If Sub-Lessee violates any of the provisions of this paragraph, Sub-Lessor, at its option, may cancel and terminate this Sub-Lease Contract."

the tying product even though it was effective "only with respect to some of the buyers" in the tied product. Here the appellant claims that the lease, financing, stocking of goods, etc. was the tying product and that the 65 percent requirement together with the services were the tied one. The jury, however, found that the appellant did not meet the burden of his case under *Fortner*, i. e., neither the dominance nor control was present nor the effect *de minimis*. As much as we feel that contracts such as are under attack here are suspect, we must respect this finding of the jury on the basic facts necessary to support a *per se* violation. The instruction [2] of the court to the jury was quite sufficient advising in the very language of *Fortner* that the standard was not one of monopoly power or dominance throughout the market for the tying product but could be sufficient even though it exists as to some buyers and might be inferred from the tying product's desirability to consumers or uniqueness in its attributes.

■ 2. Nor do we feel that the court erred in submitting the question to the jury. The proof is exceedingly weak, not only failing to show the extent of the market in automobile and accessory goods but being entirely silent on the effect of the sub-lessee agreement thereon. There is also affirmative evidence that tends to disprove these necessary elements. For example, there were only four of the sub-lease agreements in effect in the Tulsa area in a market that had over 400 stores; out of the 8000 items in the appellee's line only 14 were in the automobile accessory area; appellee had financed stores without the 65 percent requirement; and there were several other grocery wholesalers who were offering the same or a similar sub-lease arrangement. In our view the evidence was far too weak to support a directed verdict as the appellants requested.

■■ 3. Likewise we must conclude that the sub-lease was not an exclusive dealing contract which is illegal *per se* under Section 3 of the Clayton Act. The test is much more onerous than the one in tying arrangements. The exclusive dealing arrangement must be likely to foreclose competition in a substantial portion of the line of commerce affected. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 5 L. Ed.2d 580 (1961). We doubt if the evidence was sufficient to go to the jury, much less warrant a *per se* finding. However, the court submitted it to the jury under a fair instruction.[3] We cannot, therefore, disturb the jury's finding on the § 3 Clayton Act claim.

■ 4. Appellants also belatedly object to the form of the verdict [4] submit-

---

2. "The standard of sufficient economic power does not require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. The economic power over the tying product can be sufficient * * * even though the power exists with respect to some of the buyers in the market. Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes * * * [U]niquely and unusually advantageous terms can reflect a creditor's unique economic advantages over his competitors. * * * Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied product,

any restraint of trade attributable to such tying arrangements would obviously be insignificant at most."

3. "Even though the contract and/or sub-lease is found to be an exclusive dealing arrangement, it does not violate Section 3 of the Clayton Act unless it is probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected."

4. "We, the jury, find the defendant did not violate Section 1 of the Sherman Anti-Trust Act and find for the defendant.
"We, the jury, find that the defendant did not violate Section 3 of the Clayton Anti-Trust Act and find for the defendant."

ted to the jury and on which it acted. We believe it the better practice not to request the jury to pass on the ultimate legal issue, see P. Areeda, Antitrust Analysis, 45 (1967), but here the appellants fully and specifically agreed to the form of the verdict and the instructions of the court were both clear and sufficient for the jury to understand completely what it was doing by its verdict. We cannot at this time say that it was error. See Northern Pacific RR Co. v. Urlin, 158 U.S. 271, 15 S.Ct. 840, 39 L. Ed. 977 (1895); Joseph v. Rowlen, 425 F.2d 1010 (C.A.7, 1970); Western Fire Ins. Co. of Fort Scott, Kan. v. Word, et al., 131 F.2d 541 (C.A.5, 1943); 49 A. L.R.2d 1301 (1954).

5. As we have noted, there is evidence in the record that independent grocers and managers of the sub-lease stores under the advertising program would hold meetings to "decide" on prices to be charged on items selected for features treatment in advertising. Price fixing has long been held to be unlawful *per se* under § 1 of the Sherman Act, regardless of the amount of interstate commerce involved. United States v. Socony Vacuum Oil Co., 310 U.S. 150, 224 n. 159, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Appellant did not allege nor submit his case on a price-fixing theory —either at the trial court or on appeal —and does not raise the point here. Nor is there any proof in the record of any price fixing on automobile accessory products. We mention this in passing since tying arrangements like those that call for exclusive dealings are suspect and when joined with any type of price fixing would be invalid without more.

6. Several additional claims as to the admission of evidence and other matters are without merit and we do not discuss them; nor do we, in view of our decision, reach the issues relating to damages.

The judgment is affirmed.