The SPORTS CENTER, INC., A Mississippi corporation, Plaintiff-Appellant,

v.

RIDDELL, INC., Judge Little Company and Hale & Jones, Inc., a Mississippi corporation, Defendants-Appellees.

No. 80–3302.

United States Court of Appeals,
Fifth Circuit.

April 22, 1982.

Alfred Lee Felder, McComb, Miss., for plaintiff-appellant.

Watkins & Eager, Michael W. Ulmer, Jackson, Miss., for Riddell, Inc.

Frank T. Moore, Jr., Jackson, Miss., for Hale & Jones.

Little, Thrailkill & Owen, H. Stennis Little, Jr., Daniel C. Kaufman, Gerald A. Smith, Jr., Nashville, Tenn., for Little.

Before POLITZ and RANDALL, Circuit Judges *.

POLITZ, Circuit Judge:

The antitrust complaint of The Sports Center, Inc., alleges that Riddell, Inc., Judge Little Company, and Hale and Jones, Inc., conspired to damage its business, in violation of section one of the Sherman Act, 15 U.S.C. § 1.[1] At close of plaintiff's evidence, the court directed a verdict for Judge Little Company, and Hale and Jones, Inc. At conclusion of the case, the jury returned a verdict in favor of Riddell. Following denial of its post-judgment motions, The Sports Center appealed, assigning error to an evidentiary ruling, to the refusal to grant plaintiff a peremptory jury charge, and finally to the court's judgment and the jury's verdict. Finding no error, we affirm.

## Facts

Riddell is a Chicago based sports equipment manufacturer. At times pertinent to this litigation, it manufactured football hel-

---

* Jack M. Gordon, District Judge of the Eastern District of Louisiana, sitting by designation, was a member of the panel which heard oral argument. Because of his death on March 4, 1982, this case is being decided by a quorum, 28 U.S.C. § 46(d).

1. In pertinent part, 15 U.S.C. § 1 provides: "Every contract, combination ... or conspiracy, in restraint of trade or commerce ... is hereby declared to be illegal ...."

mets, football shoes, and related accessories. These products were distributed through independently owned retail sporting goods outlets, including 13 dealers in Mississippi. Riddell executed agreements which, among other things, required its dealers to service Riddell equipment before and after the sale. In addition to maintaining good business relations with customers, the requirement of service was the result of a conscious effort to reduce products liability exposure resulting from injuries caused by ill-fitting or improperly repaired equipment. Although a small company, because of the quality of the product and, at least in part, because of the cohesiveness of its organizational structure, Riddell was able to remain reasonably competitive with much larger manufacturers.

The Sports Center operates a complete line sporting goods retail outlet in Natchez, Mississippi. Its sole shareholder and president is Wade W. Craig. Desirous of securing the Riddell line with its recognized reputation, especially in the field of football helmets and shoes, Craig, on behalf of his corporation, executed, on January 23, 1976, a Full Line Dealer Agreement with Riddell. This agreement was terminated by a letter to Craig dated October 22, 1976, from James F. Rogers, vice-president of sales for Riddell. That termination serves as the basis of this antitrust litigation.[2]

### Antitrust or Anti-Bootlegging?

For a number of years prior to The Sports Center's joining the ranks of Riddell dealers, Riddell maintained a policy of discouraging sales by its dealers to anyone other than ultimate consumers. The only exceptions permitted were transfers between authorized Riddell dealers. The non-authorized sales practice, characterized by Riddell as "bootlegging," is defended by Riddell as a part of its concern and response to products liability exposure and to its competitive efforts. By protecting its dealers, Riddell concluded that it could demand more of them, especially in the field of maintenance of service and attention to detail which Riddell believed necessary in monitoring accounts.

Riddell contends that its "bootleg" ban was well known in the industry. The Sports Center asserts that it was not aware of the rule. However, the record reflects that in July of 1976, Riddell's representatives met with the Mississippi distributors to discuss matters of mutual business interest. The Sports Center opted not to attend the meeting at which the questions of products liability and the bootleg ban were discussed at length. The Riddell representatives impressed upon those present, including representatives from Judge Little, and Hale and Jones, that any suspected bootlegging should be reported. Assurances were given that Riddell would properly investigate complaints of bootlegging and, if found valid, would take the steps necessary to stop the practice.

In August of 1976, a department store in Brookhaven, Mississippi, sold a quantity of Riddell football shoes to East Mississippi Junior College, a college located near Meridian. This department store was not an authorized Riddell dealer. A representative of Hale and Jones who had attended the July meeting reported this apparent bootlegging to Riddell. Upon investigation, Neal Cordell, the Riddell sales representative responsible for the State of Mississippi, determined that the suspect shoes had been

---

**2.** The letter, concise and to the point, states:

Dear Mr. Craig:

It has come to our attention that you have violated one of the basic requirements of being a Riddell dealer by providing products to unauthorized accounts.

We have no other alternative, therefore, but to exercise our option under Paragraph 2 in your dealer agreement cancelling you as an authorized Riddell dealer effective immediately.

We are sorry that your relationship with Riddell didn't mean enough to you to protect the franchise and operate within the rules. We appreciate your business in 1976 and wish you the best of luck in the future.

Sincerely,

/s/ James F. Rogers

James F. Rogers

Vice President Sales

sold to The Sports Center, which furnished them to the department store for subsequent sale to the junior college. Cordell reported to his superior, James F. Rogers, who discussed the matter with E. L. Gordon, chairman of the board of Riddell. It was determined that the dealership of The Sports Center should be cancelled for breaching the anti-bootlegging rule. A letter to that effect, quoted at footnote 2, *supra*, followed.

Following the termination of its contractual relationship with Riddell, The Sports Center filed this antitrust action. It alleged, relying on *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), and *Klor's v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), that the three defendants had conspired to drive it from the market.

On appeal, The Sports Center principally contends that the trial judge committed reversible error when he refused to admit into evidence either a tape recording or a transcript of a telephone conversation between Craig and Cordell. The conversation, surreptitiously recorded by Craig, took place on a Sunday night, sometime after Riddell terminated The Sports Center's dealer status. The Sports Center argues that the colloquy includes comments by Cordell which suggest the existence of a prohibited "horizontal" combination among Riddell franchisees, rather than a permitted "vertical" anti-bootlegging policy. This assignment warrants careful examination, including a close scrutiny of the transcribed conversation.

### The Exclusion Dispute

The tape recording was excluded by the trial court almost *ex proprio motu*. No articulated objection was made prior to its exclusion. Citing *United States v. Clements*, 588 F.2d 1030 (5th Cir.) *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979), *United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), and Rule 901 of the Federal Rules of Evi-

dence, the appellees urge affirmance of the ruling on the ground that the tape was not authenticated adequately. In response, The Sports Center argues that the recording was authenticated sufficiently under the teachings of *United States v. Onori*, 535 F.2d 938 (5th Cir. 1976), and the *Clements* case.

Authentication was not central to the court's ruling, nor was such alluded to in the limited expressions by appellees' counsel when the tape was offered. We find error in the exclusion of both the tape and its transcription. This error, however, does not mandate a reversal for new trial; we are convinced that no prejudice was suffered. After a detailed review of the transcript of the challenged conversation, we are convinced that even if the tape or the transcript had been admitted the judge and jury, acting reasonably, would have reached the same result.

The Sports Center particularly invites attention to the following parts of the conversation as establishing the existence of an illegal combination among Riddell dealers:

Mr. Craig: And I really didn't think this Loftin deal was really . . . a major problem.

Mr. Cordell: Well, that—

Mr. Craig: I just felt as if it was really Meridian. I've been trying to pinpoint what really the problem is, and this is the only thing I can say and that's kind of what y'all discussed in—. . .

Mr. Cordell: Well, yeah, you can see—at our meeting we had, principal meetings that we had, well, you know, it was a big thing. This was part of it, you know, that we were trying to clean our act up and we wanted our dealers to support us and we were giving them, you know, a line of shoes from casual to, you know, the top-notch football shoes and everything in between. And plus we were giving them helmets and we were wanting them to support us, you know, right down the line and then in turn, we were going to support them down the line. And what happened, I believe, when the Loftin's thing [the junior college "boot-

leg" incident] came up, I believe it was sort of a—I think they—that was really sticking in their craw, the thing in Meridian and I think this just gave them something to—that Jim Rogers had told them about, you know, that—about the bootlegging, you know, I think this really just, you know, they just called our hand on it and they said here it is . . . . Mr. Craig: That's the big thing? The dealers are screaming at Meridian because of all that competition and all that? Mr. Cordell: Yeah, well—of course, you know that—I'm not—you know—you asked me to pinpoint and I'm not saying that's right or wrong. I'm just saying that's where they're—that's the hollering.

This rambling, cryptic colloquy does not establish the alleged conspiracy. Indeed, a review of the entire conversation, in context and in light of the surrounding circumstances, reflects the reverse of a horizontal monopoly. The Craig/Cordell exchange discloses that Judge Little and Hale and Jones reported an incident of bootlegging, as requested by Riddell, and Riddell terminated the offending dealer, as it had given assurances it would do. Evidence is lacking that the termination was a consequence of concerted activity by co-franchisees; rather, it was the result of imposition of Riddell's ultimate sanction for violating its anti-bootlegging rule.

### Vertical or Horizontal?

■ From the time of the seminal antitrust decision, *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), only unreasonable restraints of trade have been held to be proscribed by the Sherman Act. *See, e.g., National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Nevertheless, certain trade restrictions are so pernicious that they are categorized as *per se* violations of the antitrust laws. This characterization obviates

the costly and time-consuming exercise of determining reasonableness in every instance.[3] *See Northern Pac. Ry. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). *See also Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980); *Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Horizontal market division is one type of business agreement that uniformly has been declared unlawful. *See, e.g., National Society of Professional Engineers v. United States; Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). In this regard, agreements "among competitors which restrain competition among enterprises at the same level of distribution," *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir. 1981), are labeled properly as horizontal combinations or restrictions.

■ By comparison, vertical trade restrictions are not *per se* violations of the Sherman Act. *See, e.g., Continental T. V. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Muenster Butane, Inc. v. Stewart Co.; Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). As we recently noted:

> Vertical restraints are imposed by persons or firms further up the chain of distribution of a specific product (or in rare cases, further down the chain) than the enterprise restrained. Vertical nonprice restraints are tested under the rule of reason; that is, the plaintiff must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail.

*Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d at 295 (footnote omitted) (citations omitted). *See generally* Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48

**3.** So great is the power of the *per se* rule that we have named it "the trump card of antitrust law. When an antitrust plaintiff successfully plays it, he need only tally his score." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1363 (5th Cir. 1980).

U.Chi.L.Rev. 6 (1981). Obviously, every manufacturer has a natural monopoly over the distribution of its products. That monopoly, however, does not contravene the antitrust laws. *See, e.g., United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Parsons v. Ford Motor Co.*, 669 F.2d 308 (5th Cir. 1982).

■ Some manufacturers prefer not to deal directly with the consumer, opting instead to market their goods through independent wholesalers and retailers. To facilitate arrangements with these intermediaries, manufacturers often place restrictions on the sale of their products. A restriction may relate to the designation of a potential customer pool. *See* Note, *Restricted Channels of Distribution Under the Sherman Act*, 75 Harv.L.Rev. 795 (1962). Limitations also may concern the geographic area for distribution and sale, the times and terms of sale, and post-sale obligations. This type of restriction is characterized as vertical because its source or authority flows from a different level in the product distribution line, typically the top level or the manufacturer, than the level of imposition. Unless decidedly unreasonable, vertical restrictions upon product distribution are permissible and even desirable. As the Supreme Court has observed: "Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. at 54, 97 S.Ct. at 2559.

■ The case before us involves only a vertical restraint.[4] By asking its dealers to report infractions of its anti-bootlegging policy, Riddell did not convert its rule into a proscribed horizontal combination of distributors. The policy emanated from Riddell, the product manufacturer, at a level different from the businesses restrained. Accordingly, The Sports Center's claim is governed by the rule of reason. Under the rule of reason, a crucial aspect of a plaintiff's case is a demonstration that the alleged conduct of the defendants had some market impact. *See, e.g., Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *De-Voto v. Pacific Fidelity Life Ins. Co.*, 618 F.2d 1340 (9th Cir. 1980); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975). It "was required to prove that those restrictions had an anticompetitive effect in the relevant product and geographic markets." *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d at 295. The record is devoid of evidence establishing this anticompetitive effect.

Viewing the record from this perspective, hypothesizing that the conversation between Craig and Cordell had been admitted into evidence, the evidence does not support a different resolution of this litigation. The Sports Center grounds its complaint on the Supreme Court's *United States v. General Motors* and *Klor's, Inc. v. Broadway-Hale Stores, Inc.* decisions. Those cases are inapposite; they involve illegal horizontal combinations, not permissible vertical impositions.

In short, Riddell was entitled to impose and enforce a *reasonable* anti-bootlegging policy. This type of restriction and enforcement "is not equivalent to conspiracy." *Parsons v. Ford Motor Co.*, 669 F.2d 308, at 313 (footnote omitted). Considering Riddell's business reasons for limiting its products distribution to authorized dealers—products liability consequences and improving its competitive position in the market—in combination with its legal right to terminate a retailer, *see Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975), we conclude that the district court's direct-

---

4. As noted in *Continental T.V., Inc. v. GTE Sylvania, Inc.* and in *Muenster Butane, Inc. v. Stewart Co.*, dealers, on occasion, may agree to have their supplier "impose" restrictions upon them. The resulting "vertical" restraint is, in reality, a horizontal combination. Essentially, this is the contention made by The Sports Center. We are not persuaded. The evidence, including the Craig/Cordell conversation, does not support this contention.

ed verdicts and post-judgment decrees were not in error.[5]

### Contract Breach

 As a final matter, independent of its antitrust claims, The Sports Center suggests that the district court erred in refusing to grant a peremptory jury instruction that Riddell breached the dealership contract in its method of terminating the agreement. The Sports Center admits that its distributorship arrangement was subject to Riddell's unilateral power of termination "without cause at any time on twenty days' written notice by registered mail . . . ." Nevertheless, while conceding that it · received the termination notice, The Sports Center charges Riddell with violating the contractual terms because the letter was sent by ordinary, not registered, mail and purported to be immediate in effect.

Specifically, The Sports Center urges this court to reverse the judgment entered in favor of Riddell, based on the jury's conclusion that Riddell had substantially comported with the contract's requirements, on the ground that it was entitled to a verdict as a matter of law. In support of its position, The Sports Center refers us to *Globe Music Corp. v. Johnson*, 226 Miss. 329, 84 So.2d 509 (1956), which states the proposition that contractual terms should be construed against the drafter. While we agree that the *Globe Music Corp.* decision accurately restates Mississippi's contractual construction rule, we are not persuaded that The Sports Center was entitled to judgment as a matter of law.

The letter of termination noted that Riddell was exercising its option to cancel under Paragraph 2 of the dealer agreement. That paragraph provides as follows: "This Agreement may be terminated by the mutual agreement of the parties, or it may be terminated without cause at any time on 20 days' written notice by registered mail, either by Riddell or the authorized Dealer."

There is nothing in this record to indicate that Riddell cancelled The Sports Center's franchise on any basis not consistent with Paragraph 2. The only variance is that the notice was by regular mail rather than by registered mail. Since it is shown that the notice was received, in the context of this case, the mode of postal delivery is insignificant.

The jury returned a verdict for Riddell. Inherent in that finding is a conclusion that Riddell had not actionably breached its contractual obligations to The Sports Center. We discern no basis for disturbing this jury finding.

AFFIRMED.

---

**5.** *See, e.g., American Telephone & Telegraph Co. v. Delta Communications Corp.*, 590 F.2d 100 (5th Cir.), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979).