Richard M. STEARNS, Trustee in Bankruptcy for Carolina Acoustics Co., Inc., Plaintiff,

v.

GENRAD, INC., Defendant.

No. C-79-606-D.

United States District Court,
M.D. North Carolina,
Winston-Salem Division.

May 26, 1983.

Noel Lee Allen and William D. Harazin, Raleigh, N.C., for plaintiff.

R.M. Stockton, Jr. and George L. Little, Jr., Winston-Salem, N.C., for defendant.

## MEMORANDUM OPINION

ERWIN, District Judge.

This matter is before the court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The court has reviewed the voluminous record compiled in this case and for the reasons stated herein, grants the defendant's motion for summary judgment as to plaintiff's claims under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; as well as plaintiff's claims under Chapter 75 of the North Carolina General Statutes, plaintiff's allegation of a breach of the distributorship agreement between the parties, and plain-

1312

tiff's claims of unfair competition under common law. The court denies the plaintiff's motion for summary judgment.

Carolina Acoustics Company, Inc. (CAC), a former distributor of several products manufactured by defendant GenRad, Inc. (GenRad) commenced this private antitrust suit in September 1979. The original complaint alleged violations of various federal and state antitrust statutes and a breach of the distributorship agreement between the parties. In August 1982, CAC amended its complaint and thereby substituted Richard M. Stearns, Trustee in Bankruptcy for CAC, as the plaintiff in this action and added a claim of common law unfair competition to the complaint.

CAC became a non-exclusive distributor of GenRad portable sound measurement products on or about December 10, 1974.[1] Those sound measurement products included sound level meters, dosimeters, octave band analyzers, and accessories for those measurement devices. In January 1979, GenRad notified CAC that it would be terminated as a distributor effective February 5, 1979 pursuant to the distributorship agreement. The stated reason for the termination was an effort to reduce distribution costs. The plaintiff alleges that during the period it was a distributor of GenRad and upon the unilateral termination of its distributorship agreement with GenRad, a course of conduct followed which was anticompetitive, monopolistic, and resulted in a restraint of trade.

■ The court is mindful that summary judgment should be sparingly granted in complex antitrust actions, especially where intent and motive play an important role in the case. *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979). On the other hand, it is quite clear that Rule 56 of the Federal Rules of Civil Procedure still

applies to antitrust actions and that where, as in the instant case, the action is not so complex and does not necessarily turn upon intent and motive, summary judgment is a proper means of disposing of the litigation.

### Sherman Act § 1 Violations

Count One of the amended complaint alleges activity by defendant GenRad during the period of December 1974 through February 1979 which the plaintiff contends was violative of Section 1 of the Sherman Act, 15 U.S.C. § 1. That alleged activity includes exclusive dealing, full line forcing, resale price maintenance, imposition of territorial restrictions, imposition of customer restrictions, and preemption of CAC's market by termination of CAC as a GenRad distributor. CAC also alleges that the above activity unreasonably restrained interstate commerce and damaged CAC at least to the extent of $6,000,000.

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides: "Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal."

■ A cause of action under § 1 of the Sherman Act may be sustained by proof of the existence of a contract, combination, or conspiracy which produced adverse, anticompetitive effects within relevant product and geographic markets along with proof that the objects of and the conduct pursuant to the agreement were illegal, and the plaintiff was injured as a proximate result of the agreement. *Martin B. Glauser Dodge Co. v. Chrysler Corp.,* 570 F.2d 72, 81 (3d Cir.1977). "Unless the particular restraint falls within a category that has been judicially determined to be illegal per se, the legality of a restraint challenged under § 1 of the Sherman Act must be assessed under the rule of reason." *Id.* at 82.

---

1. CAC was also a *commissioned sales representative* for Grason-Stadler audiometric products during the entire period of time it was a GenRad distributor, having become such a sales representative prior to 1974 and having remained such until sometime after this litigation was commenced. Grason-Stadler was first a subsidiary and later an unincorporated division of GenRad, until it was spun off on January 1, 1978. All of the claims in this litigation relate to CAC's relationship with GenRad as one of its sound product *distributors* and not to its relationship with Grason-Stadler.

*Per se* violations of § 1 of the Sherman Act presently consist of price fixing, whether horizontal or vertical, *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 379–80, 71 L.Ed. 700 (1927); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224–26 & n. 59, 60 S.Ct. 811, 845–46 & n. 59, 84 L.Ed. 1129 (1940); *United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); concerted refusals to deal (or group boycotts), *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); certain tying arrangements, *Northern Pacific Railway v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *International Salt Co., Inc. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); and *horizontal* allocation of markets by customer or territory, *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). Other activity which is alleged to violate Section 1 of the Sherman Act must be judged by the rule of reason, which requires some analysis of the effect of the alleged restraint upon overall competition in the relevant market. *Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Rice Tire Co. v. Michelin Tire Corp.,* 638 F.2d 15 (4th Cir.1981). Under the rule of reason, the court should focus on the preservation of competition, not individual competitors. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

*Exclusive Dealing*

CAC contends that when CAC became a distributor, GenRad required CAC to discontinue handling competing products. CAC's proffered evidence in support of this claim consists of the testimony of CAC's former president and owner, Doyle Chandler, to the effect that: (1) CAC was forced by GenRad, under threat of termination, to drop the Columbia line when it took on GenRad in December 1974; (2) CAC was not thereafter allowed by GenRad to carry any other type of sound level meter; (3) CAC did in fact eliminate its Columbia inventory about sixty days after it became a GenRad distributor; and (4) CAC sold no competing sound level meters or dosimeters from that time until CAC was terminated by GenRad in January 1979. CAC also offered the affidavit of Robert Guinta, another former GenRad distributor, to the effect that an unnamed GenRad representative announced at a meeting attended generally by GenRad distributors that GenRad did not want its distributors handling competing lines. The court notes that CAC's proffered evidence of an exclusive dealing arrangement would appear to strain the credibility of any reasonable jury, since CAC's own documents demonstrate, contrary to the testimony proffered, that CAC did not eliminate its Columbia inventory after it became a GenRad distributor. Those documents indicate that CAC carried Columbia inventory throughout the time it was a GenRad distributor and continued to make sales of competing sound level meters and dosimeters during most of the period it was a GenRad distributor. CAC's own documents also demonstrate that it was Columbia which elected to terminate its relationship with CAC because CAC failed to pay the company for Columbia products that CAC had ordered and received. Consequently, this court questions whether, in the face of such documentary evidence generated by the complaining party, there is any genuine issue of material fact on the basis of which any jury could reasonably determine that GenRad imposed an exclusive dealing arrangement upon CAC. Assuming that a factual issue does exist regarding the imposition of an exclusive dealing arrangement, summary judgment for GenRad is nevertheless appropriate on this issue because CAC has failed to undertake to meet its burden of demonstrating the requisite effect upon competition. In *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320,

81 S.Ct. 623, 5 L.Ed.2d 580 (1961), which still appears to be the leading case on exclusive dealing arrangements, the Supreme Court stated as follows:

> In practical application, even though a contract is found to be an exclusive dealing arrangement, it does not violate the Section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected. . . . In short, the threatened foreclosure of competition must be in relation to the market affected. . . .
>
> . . . [T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited as was pointed out in *Standard Oil Company v. United States* [337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371], *supra.*

365 U.S. at 327, 81 S.Ct. at 628.

The only effort undertaken by CAC to demonstrate the effect of the alleged exclusive dealing arrangement on competition consists of "guesstimates" by its former president and its expert witness of gross sales allegedly lost by CAC as a result of not having been able to continue to carry the Columbia and possibly other lines competitive with GenRad products. That type of showing, even if made, falls far short of demonstrating the requisite effect upon competition. That type of evidence does not demonstrate the ability of GenRad's competitors to reach the ultimate consumer with their competing products, nor does it demonstrate the ability of the consuming public to make a purchasing decision from among the various competitors in the field. CAC has made no attempt to determine who the other competitors were in the market, whether other distributors were available to those competitors, whether those competitors in fact needed distributors to get their competing products to the consumer, and what, if any, effect the alleged exclusive dealing arrangement may have had upon the ultimate consumer of and competition in the products in question. Nor has CAC made any attempt to show

whether other GenRad distributors sold competing lines of products while they were GenRad distributors. In short, CAC has not shown, nor has it attempted to show, any adverse effect on overall competition in any line of commerce or relevant market resulting from the alleged exclusive dealing arrangement. For that reason, GenRad is entitled to summary judgment on this issue. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Lupia v. Stella D'Oro Biscuit Co.,* 586 F.2d 1163 (7th Cir.1978); *Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.,* 459 F.2d 138 (6th Cir.1972); *Smith v. Scrivner-Boogaart, Inc.,* 447 F.2d 1014, 1017 (10th Cir.1971), *cert. denied,* 404 U.S. 1059, 92 S.Ct. 740, 30 L.Ed.2d 747 (1972).

*Full Line Forcing*

■ CAC also contends that GenRad forced its full line of measurement instruments upon CAC in quantities exceeding CAC's reasonable requirements or demands. The evidence proffered by CAC on this issue indicates that CAC's complaint is that GenRad forced an excessive amount of inventory in certain products upon CAC. Mr. Doyle Chandler testified in his deposition that CAC's inventory of GenRad equipment was as high as $140,000 and that a reasonable level of inventory would have been between $80,000 and $100,000; however, Mr. Chandler also testified that there was no specific requirement that CAC carry the $140,000 inventory and that much of the $140,000 inventory consisted of Grason-Stadler products which are not at issue in this litigation.

Documents produced by the plaintiff in discovery refute any claim of excessive inventory. Those documents demonstrate that the highest level of CAC's inventory of GenRad products was $25,963 on January 31, 1976. In addition, the plaintiff has made no attempt to analyze or demonstrate any adverse effect upon overall competition in any relevant market as a result of the alleged conduct by GenRad.

Full line forcing is a violation of the antitrust laws only if the effect of such

forcing "may be to substantially lessen competition ... in any line of commerce." In order to establish such a transgression, it must be shown that the seller had economic power in the market for the forcing item and that a substantial amount of commerce relating to the forced item was foreclosed. *Pitchford v. Pepi, Inc.,* 531 F.2d 92, 100 (3d Cir.1976) (footnotes omitted) (quoting 15 U.S.C. § 14). CAC has made no showing of any anti-competitive effect in any relevant market. Therefore, the defendant is entitled to summary judgment on the issue of full line forcing.

*Resale Price Maintenance*

The plaintiff alleges that GenRad attempted to restrict the price at which CAC could sell GenRad products to its customers by limiting CAC discount sales to state agencies. The only evidence in the record to support such claim is the deposition testimony of Mr. Doyle Chandler, who testified that GenRad did not like discounting and told him that CAC should try to keep its prices at a high level and discount GenRad products no more than five percent.

■■■ An illegal combination to fix prices results "if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy." *United States v. Parke, Davis & Co.,* 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 405 (1960). There is no evidence that GenRad used any coercive measures to induce CAC to charge any particular resale price for GenRad products. CAC's own documents reveal that CAC sold GenRad products to the State of North Carolina at various levels of discount above five percent. The court is of the opinion that no genuine issue as to any material fact exists regarding the claim of resale price maintenance. In addition, the plaintiff has failed to show any antitrust injury. The deposition testimony of Mr. Chandler reveals only one instance of sales loss by CAC as a result of its alleged adherence to GenRad's suggestion and that loss was recaptured by CAC. "[O]ne of the essential elements for recovery under the antitrust laws is that

the claimant be injured or damaged." *Gray v. Shell Oil Co.,* 469 F.2d 742, 748 (9th Cir.1972). GenRad is entitled to summary judgment on the issue of resale price maintenance.

*Territorial and Customer Restrictions*

■■■ CAC's allegations relating to territorial and customer restrictions include claims that (1) CAC was restricted to sales in a geographical territory that included North Carolina, South Carolina, Georgia, Alabama, and Eastern Tennessee, (2) CAC was prohibited from selling or attempting to sell GenRad products to the General Services Administration (GSA), and (3) CAC was prohibited from selling GenRad products to other Grason-Stadler division sales representatives who were not GenRad distributors.

Once again CAC has made no attempt to show any adverse effect upon competition in any relevant market as a result of the alleged territorial and customer restrictions. CAC has made no study or other analysis of the other competitors in the market, or to what extent, if any, overall competition has been impaired as a result of the alleged restrictions. CAC has limited its analysis to its own very rough estimates of its gross sales allegedly lost as a result of the alleged imposition of territorial and customer restrictions. Consequently, the defendant GenRad is entitled to summary judgment on this issue. *Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Sherman v. British Leyland Motors Limited,* 601 F.2d 429, 450 (9th Cir.1979); *The Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786, 791 (5th Cir. 1982).

■■■ Although it is undisputed that GenRad (and not CAC) was the manufacturer of the products in question and that CAC acted solely as a distributor of some of these products, CAC argues that because GenRad elected to make direct sales through its own sales force in addition to indirect sales through distributors such as CAC, GenRad and CAC were therefore competitors operating at the same level of

the market; and that the alleged imposition of territorial and customer restrictions by GenRad were therefore "horizontal" rather than "vertical," thereby mandating *per se* antitrust treatment pursuant to the teaching of *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). That argument must be rejected by the court due to the absence of evidence that the alleged restrictions emanate from and work to the benefit of other distributors who are competitors of the injured distributor, which is not even alleged here. *Rice Tire Co. v. Michelin Tire Corp.,* 638 F.2d 15 (4th Cir.1981), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001 (5th Cir.1981), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981); *The Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786 (5th Cir.1982); *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348 (9th Cir.1982). CAC has offered no evidence nor has it even contended that the alleged territorial and customer restrictions originated anywhere other than with GenRad. Consequently, the court considers rule-of-reason analysis to be appropriate to this issue, which mandates summary judgment for defendant GenRad.

*Termination of CAC*

 Even though the amended complaint at Paragraph 9 specifically alleges the "period involved" in Count One to be December 1974 until February 1979, read in the light most favorable to the plaintiff CAC and considered in conjunction with the entire record, it appears to include a complaint of unlawful termination by GenRad of CAC's distribution rights to GenRad products. Furthermore, in its answer to Interrogatory No. 2, CAC affirmatively states its contention that GenRad conspired with its former Grason-Stadler division and its president, Rufus Grason, in terminating CAC as a distributor. Consequently, for the purpose of these cross-motions for summary judgment, the court will consider CAC's claims to include one claim to the effect that GenRad unlawfully conspired with Grason-Stadler and Rufus Grason to terminate CAC's distributorship. A careful

and close review of the entire record indicates no evidence of a conspiracy between Grason-Stadler and GenRad. CAC's own witnesses have testified to the contrary. Mr. Doyle Chandler testified that "a decision had been made at a corporate level [at GenRad] to sell direct and bypass distributors" and that he had no information regarding the termination other than the information contained in the letter he received from GenRad (GenRad Exhibit 62). Other former CAC employees confirmed GenRad's position that it made an internal, unilateral decision to terminate CAC and its other distributors. The documentary evidence before the court, as well as deposition testimony from GenRad personnel, is uniform to the effect that GenRad's decision was internal and unilaterally made. The voluminous documentary evidence in the record is also uniform to the effect that GenRad was motivated by a desire to reduce distribution costs in terminating all of its remaining distributors. There is no evidence in the record which indicates that GenRad in any way singled out CAC or that GenRad's decision to terminate its distributors was anything other than a unilateral decision to terminate all distributors in an effort to reduce distribution costs.

Since there is no evidence in the voluminous record that GenRad's action in terminating CAC and its other remaining distributors was other than unilaterally made, GenRad is entitled to summary judgment on this issue. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 624 F.2d 476, 483 (4th Cir.1980); *Hester v. Martindale-Hubbell, Inc.,* 659 F.2d 433, 436 (4th Cir.1981); *Call Carl, Inc. v. BP Oil Corp.,* 554 F.2d 623 (4th Cir.1977), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977).

*Clayton Act, § 3 Violations*

Count Two of CAC's amended complaint alleges that GenRad imposed an exclusive dealing requirement upon CAC, thereby violating § 3 of the Clayton Act, 15 U.S.C.

§ 14, in addition to Section 1 of the Sherman Act, 15 U.S.C. § 1, as discussed above.

Section 3 of the Clayton Act, 15 U.S.C. § 14, provides in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods ... or other commodities ... for use, consumption, or resale within the United States ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale of such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Exclusive dealing arrangements normally take the form of an agreement whereby a purchaser agrees to purchase exclusively for a significant period of time from one supplier. The perceived evil in such an agreement is that it may foreclose the supplier's competitors from the market represented by the purchaser for the period of time involved. Exclusive dealing arrangements have traditionally been treated somewhat more leniently than tying arrangements because of the recognition that exclusive dealing arrangements may have procompetitive effects and may be motivated by other than anti-competitive desires on the part of the seller. Consequently, exclusive dealing arrangements have not been considered *per se* illegal, and before reaching a decision, the courts have made at least some analysis of the competitive effects of the exclusive dealing arrangement. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 329, 81 S.Ct. 623, 629, 5 L.Ed.2d 580 (1961). In *Tampa Electric,* the Court made it clear that no liability for exclusive dealing arises under either § 3 of the Clayton Act or § 1 of the Sherman Act absent a showing that there is a probability of foreclosure of competition in a substantial share

of the line of commerce affected. *Tampa Electric,* 365 U.S. at 335, 81 S.Ct. at 632.

The record in the instant case lacks any evidence of an exclusive dealing arrangement.[2] Assuming, however, the existence of an exclusive dealing arrangement, summary judgment is nevertheless appropriate in this case because the plaintiff has failed to present the relevant economic analysis. There is no evidence that GenRad's competitors or the ultimate consumers of portable sound measurement products were affected in any way. CAC has not attempted to show any adverse impact on overall competition resulting from the alleged exclusive dealing arrangement. In addition, the plaintiff has failed to show any injury to it due to the alleged conduct. Consequently, the defendant is entitled to summary judgment on this issue.

### Attempt to Monopolize

Section 2 of the Sherman Act makes it unlawful to "attempt to monopolize ... any part of the trade or commerce among the several states." 15 U.S.C. § 2.

The basic principles governing application of § 2 of the Sherman Act have been concisely stated by the Fourth Circuit. "There is no attempt to monopolize within the prohibition of § 2 of the Sherman Act, unless there is both an intent to monopolize and a "dangerous probability" that an actual monopoly will be achieved." *White Bag Co. v. International Paper Co.,* 579 F.2d 1384, 1387 (4th Cir.1974) (citations omitted). Consequently, the first task that must be undertaken by any antitrust plaintiff alleging attempted monopolization under § 2 of the Sherman Act is to define and establish a relevant market, consisting both of a relevant product market and a relevant geographic market. While the parties agree that the relevant geographic market is the United States, the parties do not agree on the relevant product market. More importantly, the record is void of any attempt by CAC to ascertain the facts from which the relevant product market contended by it

**2.** *See* Sherman Act, § 1 Violations, *supra.*

might be inferred. CAC contends that the relevant product market consists of portable sound measuring devices of the type sold by GenRad to its distributors. However, there is no basis in the record from which a reasonable jury could infer that the relevant product market in this action should be limited to only those portable sound measuring devices which GenRad sold to CAC while it was a distributor. CAC has provided the court with absolutely no analysis relating to functional interchangeability of products or the cross-elasticity of demand for products, which is its burden in order to establish a relevant product market. *United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). In *DuPont,* the Supreme Court summarized the rule as follows:

> The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered.

*DuPont,* 351 U.S. at 404, 76 S.Ct. at 1012. Here, CAC has assumed a product market limited to products it purchased from Gen-Rad. That assumption does not meet CAC's burden of providing some analysis of functional interchangeability and cross-elasticity of demand and supply from which a jury could reasonably find a product market. Consequently, CAC's § 2 claim fails initially because of plaintiff's failure to establish a relevant product market. *United States v. Empire Gas Corp.,* 537 F.2d 296 (8th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

The voluminous record established by the parties in this litigation also fails to demonstrate a dangerous probability of GenRad's achieving monopoly power in any relevant market. There is no evidence that GenRad achieved the dominance of the market necessary to create a monopoly assuming Gen-Rad did possess the requisite intent. CAC does not contend that GenRad ever achieved more than a fifty percent market share, which negates the element of a dangerous probability of success. CAC accepts GenRad's estimate of forty-nine percent as GenRad's market share. That alone is insufficient to show a dangerous probability of success. *Empire Gas, supra; Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 974 (8th Cir.1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748. CAC has also failed to show any impact on any relevant market attributable to any activity of Gen-Rad. That failure negates the element of dangerous probability of success. *Pacific Eng'r & Prod. Co. v. Kerr-McGee Corp.,* 551 F.2d 790 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977). Summary judgment is appropriate as to the issue of attempted monopolization.

### North Carolina Antitrust Claims

Count Four of CAC's amended complaint alleges that the same acts and conduct on the part of GenRad which CAC contends violate § 1 of the Sherman Act also violate §§ 75–1, 75–5(b)(2), 75–5(b)(3), and 75–1.1 of the North Carolina General Statutes. For the reasons stated above as to why GenRad is entitled to summary judgment on CAC's claims under § 1 of the Sherman Act, GenRad is also entitled to summary judgment under these sections of the North Carolina "antitrust" statutes. *Rose v. Vulcan Materials Co.,* 282 N.C. 643, 655, 194 S.E.2d 521, 530 (1973). In addition, the court notes that whether or not a certain act or practice violates N.C.Gen.Stat. § 75–1.1 is a question of law to be determined by the court. In this regard, taking the evidence in the light most favorable to the plaintiff CAC, the court sees no act or practice demonstrated in the record on the part of GenRad which would be violative of N.C.Gen.Stat. § 75–1.1. Finally, as was noted above, CAC has made absolutely no effort to demonstrate any effect upon overall competition in any relevant market. *Johnson v. Phoenix Mutual Life Insurance Co.,* 300 N.C. 247, 266 S.E.2d 610 (1980); *Marshall v. Miller,* 302 N.C. 539, 276 S.E.2d 397 (1981).

## Breach of Contract

CAC contends that GenRad breached the terms and provisions of the distributor agreement as follows:

1. By failing to refer customer orders as required;

2. By withholding measurement instruments from CAC and pre-empting CAC's territory by making direct sales to CAC's customers;

3. By conducting a telephone sales campaign in which GenRad allegedly secretly contacted and misled CAC's customers for the purpose of making direct sales to them; and

4. By engaging in conduct and activities which impaired and eventually nullified CAC's rights under the distributor agreement.

Although the written agreement between the parties is silent on the subject of referral of customer orders, GenRad's "Statement of General Radio Company Distributor Policy" contains the following provision regarding referral of customer orders:

> Customer orders received at GenRad district offices for small quantities of standard catalog items are to be referred to the nearest distributor subject to the following. All referrals will be based on the known availability of the required items in the distributor's stock. The distributor is expected to refer to GenRad all orders falling below the quantity limits normally handled by the distributor in the usual course of business and orders for items requiring modification or special design.

CAC offers no testimony or documentary evidence which tends to show that GenRad breached the foregoing provision of its distributor policy, assuming that such policy was a part of the agreement between the parties.

The only evidence in the record that GenRad withheld products from CAC is to the effect that GenRad did so when CAC was on "credit hold" and was not paying for products which CAC had ordered and which GenRad had already shipped to CAC. The court finds no evidence of GenRad's withholding any products from CAC in violation of the agreement between the parties.

With regard to GenRad's direct telephone selling campaign, the court again finds no evidence that GenRad secretly contacted or misled any of CAC's customers for any purpose. There is evidence in the record that GenRad conducted a direct telephone selling campaign beginning in the spring of 1978. However, there is no evidence that any calls were made which were not authorized by the agreement between the parties; nor is there any evidence that GenRad said or did anything improper in the course of any such calls. The agreement between the parties allowed GenRad to compete directly with CAC in the sale of GenRad products. Consequently, the fact of the direct telephone selling campaign and the fact of GenRad's making sales calls on customers or potential customers which CAC either was soliciting or wanted to solicit is specifically authorized under the agreement.

Finally, the record is clear that GenRad complied with the agreement between the parties in terminating CAC as a distributor. GenRad gave CAC the notice in writing to which it was entitled before terminating the distributor agreement between the parties.

For the foregoing reasons, GenRad is entitled to summary judgment with regard to CAC's claim for breach of contract.

## Common Law Unfair Competition

The final contention is that GenRad, by engaging in the acts and conduct which CAC contends violate § 1 of the Sherman Act, also violated the common law of unfair competition, both in the United States and in North Carolina.

At the outset, the court questions whether there is any separate federal law of unfair competition. In *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), Justice Brandeis, writing for the Supreme Court, said: "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the State

. . . . There is no Federal general common law."

Traditionally at common law, including that of North Carolina, the tort of unfair competition consisted of acts or practices by a competitor which are likely to deceive the consuming public. *Charcoal Steak House of Charlotte, Inc. v. Staley,* 263 N.C. 199, 139 S.E.2d 185 (1964). The tort has traditionally been applied to practices such as trademark or trade name infringement, imitation of a competitor's product or its appearance, interference with a competitor's contractual relations, disparagement of a competitor's product or business methods, and misappropriation of a competitor's intangible property rights such as advertising devices or business systems. Note, "Unfair Competition—Law of Unfair Competition in North Carolina," 46 N.C.L.R. 856 (1967–68).

A thorough review of the record before this court discloses no evidence that GenRad has damaged CAC by engaging in any practice heretofore determined to constitute common law unfair competition, nor does it disclose any evidence of any practice by GenRad which, though not yet crystallized as an act of unfair competition, would shock the judicial sensibilities of this court. Consequently, GenRad is entitled to summary judgment on that issue.