Mezcalito Apex, Inc. v. Murillo, 2026 NCBC 14.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV003825-910

MEZCALITO APEX, INC.,

     Plaintiff,

v.

OSCAR FERNANDO MURILLO,

     Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS**

1. **THIS MATTER** is before the Court on the 17 October 2025 filing of *Defendant's Motion to Dismiss* (the Motion). (ECF No. 21 [Mot.].) Pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the Rule(s)), Defendant Oscar Fernando Murillo (Defendant) seeks dismissal of all claims alleged against him by Plaintiff Mezcalito Apex, Inc. (Plaintiff). (Mot. 1.)

2. For the reasons set forth herein, the Court **GRANTS** in part and **DENIES** in part the Motion.

*Cunningham Law, PLLC by James Calvin Cunningham and J. Caitlyn Bullock, for Plaintiff Mezcalito Apex, Inc.*

*Williams Mullen by Michael C. Lord and Lewis H. Hallowell, for Defendant Oscar Fernando Murillo.*

Robinson, Chief Judge.

## I. INTRODUCTION

3. This action arises out of Plaintiff's contention that Defendant, a former senior-level employee at one of Plaintiff's Tex-Mex restaurants, breached his confidentiality agreement, misappropriated Plaintiff's trade secrets, and participated

in unfair and deceptive trade practices in an effort to create a substantially identical Tex-Mex restaurant in Missouri.

## II. FACTUAL BACKGROUND

4. The Court does not make findings of fact when ruling on a motion to dismiss pursuant to Rule 12(b)(6) and only recites those factual allegations relevant and necessary to the Court's determination of the Motion.

### A. The Parties

5. Plaintiff is a North Carolina corporation with its principal office in Wake County, North Carolina. (Am. Compl. ¶ 1, ECF No. 14.)

6. Defendant is a citizen and resident of Wake County, North Carolina, and was formerly employed by Plaintiff. (Am. Compl. ¶ 2.)

### B. Plaintiff's Business

7. Plaintiff owns and operates a Tex-Mex restaurant in Apex, North Carolina, known as Mezcalito, which is part of a larger, privately-owned Tex-Mex restaurant chain that currently operates more than eight separate locations throughout North Carolina. (Am. Compl. ¶¶ 1, 7.)

8. Mezcalito's brand has been established "through its use of particularized aesthetics and cosmetics including food preparations, drink preparations and distinctive cantaritos, particular elements of its menus, as well as restaurant decor, elements of lighting, hearth, mantle, tables and booths and vibrant wall colors." (Am. Compl. ¶ 8.) Mezcalito distinguishes itself from other Tex-Mex restaurants by "combin[ing] traditional signature recipes with unique preparations such as the

'Salsa Chip' and the 'Ultimate ACP' with particular ingredients, with particular seasonings and flavorings and from particular suppliers, in unique proportions to deliver a distinctive 'upscale' and authentic culinary experience." (Am. Compl. ¶ 8.)

## C.     <u>Defendant's Employment with Plaintiff</u>

9.     Defendant began his training and full-time employment with Plaintiff on or about 13 March 2023. (Am. Compl. ¶ 11.)

10.     As part of his senior-level employment, Defendant became knowledgeable regarding Plaintiff's recipes, ingredients, business plans, menus, costs, and revenues. (Am. Compl. ¶ 11.)

11.     On 21 March 2023, Defendant entered into a Non-Competition, Non-Disclosure & Confidentiality Agreement with Plaintiff (the Employment Agreement). (Am. Compl. ¶ 14; *see also* Def.'s Br. Supp. Mot. Ex. A, ECF No. 22.2 [Agmt.].)

12.     Section 1(b) of the Employment Agreement provides:

> Employee acknowledges that the Company's business and services are highly specialized, the identity and particular needs of the Company's customers and suppliers are not generally known, and the documents and information regarding the Company's customers, suppliers, services, methods of operation, sales, pricing, recipes and costs are highly confidential and constitute trade secrets. Employee further acknowledges that the services rendered to the Company by Employee have been or will be of a special and unusual character which have a unique value to the Company and that Employee has had or will have access to trade secrets and confidential information belonging to the Company, the loss of which cannot adequately be compensated by damages in an action at law. Employee acknowledges that the Trade Secrets and Confidential Information disclosed to Employee during the course of Employee's at-will employment is a [sic] of a special and unique character, is not generally known in the Company's industry, and the

Company has a proprietary interest in its Trade Secrets and Confidential Information.

(Agmt. § 1(b).)

13. Section 2(a) of the Employment Agreement further provides that

Employee shall not use, communicate, reveal or otherwise divulge to, or use for the benefit of any person, partnership, Company or other entity other than the Company and certain others specifically designated in writing by the Company, either during the term of or after the termination of Employee's at-will employment, any Trade Secrets or Confidential Information obtained by Employee in connection with Employee's at-will employment by the Company, regardless of whether such termination is initiated by Employee or the Company.

(Agmt. § 2(a).)

14. The Employment Agreement defines "Confidential Information" as

knowledge or information in any form concerning the Company, its owners, partners, officers, agents, joint venturers, or affiliates, which was learned, disclosed, or made available by the Company to Employee incident to his affiliation with the Company that Employee knows or has reason to know has commercial value because it is not generally known in the "Tex-Mex" restaurant trade or industry. Confidential information of the Company shall include, without limitation: (a) the current, future and proposed menus, ingredients, food or drink recipes or preparations of the Company or its Affiliates, as well as financial, ordering, technical, research, operational, sales and marketing literature or information related thereto; (b) ideas, inventions, works of authorship, technical manuals, training materials, restaurant concepts, designs and aesthetics, computer software and programs or any other information, however documented, that is a trade secret or proprietary information within the meaning of applicable law, including N.C.G.S. § 66-152; (c) business plans, business forecasts, contracts, budgets, prices and costs, margins, financial statements, tax information, research, sales and distribution arrangements, and the identity of partners, suppliers, vendors and customers; (d) the existence of any business discussions, negotiations or agreements between the Company and any third party; (e) any information marked as confidential or otherwise represented by the Company as confidential either before or within a reasonable time after its disclosure; and (f) any information regarding the skills and

compensation of employees, contractors or other agents of the Company or its Affiliates.

(Agmt. § 3.)

15. Expressly excluded from the Employment Agreement's definition of "Confidential Information" is information that

> (i) was in the public domain at the time it was disclosed or made available to Employee; (ii) entered the public domain subsequent to disclosure to Employee through no fault of Employee; (iii) was independently developed by Employee without use or reference to Confidential Information of the Company as demonstrated by contemporaneously prepared documentation; or (iv) was disclosed to Employee by a third party that did not breach any obligations of confidence by making such disclosure.

(Agmt. § 3(a).)

## D.  Events Giving Rise to Litigation

16. After leaving his employment with Plaintiff in the fall of 2024, Defendant relocated to Springfield, Missouri, where he worked for another Tex-Mex restaurant, Habaneros Mexican + Cantina (Habaneros).  (Am. Compl. ¶ 2.)

17. While employed by Habaneros, Defendant became a twenty-five percent (25%) owner and was responsible for developing its menus, recipes, preparations, drinks, and other elements of the restaurant.  (Am. Compl. ¶ 21.)

18. Plaintiff alleges that, in carrying out these tasks and responsibilities for Habaneros, Defendant implemented changes at Habaneros that were copies of Plaintiff's menu, recipes, preparations, drinks, decorations, glassware, dishes, dish preparations, dish names, and aesthetics.  (Am. Compl. ¶ 22).

19.     As detailed further below, Plaintiff originally sued both Defendant and Habaneros.  As part of its settlement with Plaintiff, Habaneros terminated Defendant's employment and implemented changes to its restaurant to make it distinct from Mezcalito.  (Am. Compl. ¶ 23.)

20.     Defendant has since moved back to Cary, North Carolina, where he is currently employed by another Tex-Mex restaurant, Aqui Mero.  (Am. Compl. ¶ 2.)

21.     Plaintiff alleges that Defendant has communicated with Plaintiff and admitted to breaching the Employment Agreement and that Defendant knew his conduct was wrongful.  (Am. Compl. ¶ 24.)

### III.    PROCEDURAL BACKGROUND

22.     On 31 January 2025, Plaintiff and another entity, Mezcalito, Inc., initiated this action against Defendant and Habaneros upon the filing of the *Complaint*.  (ECF No. 3.)

23.     On 20 August 2025, with leave of court, Plaintiff filed its *Amended Complaint*.[1]  (ECF No. 14.)

24.     On 17 October 2025, Defendant filed the Motion.  Following full briefing, the Court held a hearing on the Motion on 21 January 2026 (the Hearing), at which all parties were represented by counsel.  (*See* ECF No. 26.)

25.     The Motion is ripe for resolution.

---

[1] Mezcalito, Inc. is not a party to the *Amended Complaint*.  (*See* ECF No. 14.)  Further, the matter has been resolved between Plaintiff and Habaneros, resulting in the entry of a *Consent Permanent Injunction*, (ECF No. 17), prohibiting Habaneros from engaging in certain conduct.  Thus, Plaintiff does not assert any claims against Habaneros in its *Amended Complaint*.  (*See* Am. Compl. ¶ 3.)

## IV. LEGAL STANDARD

26. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleadings as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Hum. Servs.*, 174 N.C. App. 266, 274 (2005) (quotation marks and citation omitted).

27. Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (citations omitted). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (citation and quotations omitted).

28. Our Supreme Court has observed that "[i]t is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses

some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citations omitted). This standard of review for Rule 12(b)(6) motions is the standard our Supreme Court "routinely uses . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 615 n.7 (citations omitted).

## V. ANALYSIS

29. Defendant moves to dismiss all of Plaintiff's claims against him, which include: (1) breach of contract, (Am. Compl. ¶¶ 25–29), (Count One); (2) misappropriation of trade secrets in violation of N.C.G.S. § 66-152, *et seq.*, (Am. Compl. ¶¶ 30–42), (Count Two); (3) unfair and deceptive trade practices pursuant to N.C.G.S § 75-1.1, *et seq.* and common law unfair competition, (Am. Compl. ¶¶ 43–47), (Count Three); and (4) preliminary and permanent injunction, (Am. Compl. ¶¶ 48–56), (Count Four). The Court will address each claim in turn.

### A. Count One: Breach of Contract

30. Plaintiff alleges that Defendant has breached the Employment Agreement by providing Habaneros with information defined as confidential under the Employment Agreement. (Am. Compl. ¶ 27.)

31. To properly plead a breach of contract claim, the claimant must allege "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000) (citing *Jackson v. Cal. Hardwood Co.*, 120 N.C. App. 870, 871 (1995)). Where each of these elements are alleged, "it is error to dismiss a breach of contract claim under Rule 12(b)(6)." *Woolard v. Davenport*,

166 N.C. App. 129, 134 (2004) (citation omitted). "[S]tating a claim for breach of contract is a relatively low bar." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *11 (N.C. Super. Ct. June 19, 2019).

32. Defendant contends that the breach of contract claim fails because the Employment Agreement "only prohibits [Defendant] from disclosing [Plaintiff's] trade secrets, and [Plaintiff's] allegations of breach do not involve trade secrets." (Def.'s Br. Supp. Mot. 14, ECF No. 22 [Br. Supp.].) Specifically, Defendant notes that the Employment Agreement (i) defines confidential information in a way that "tracks the definition of 'trade secrets' under North Carolina law"; (ii) provides that the duty to maintain confidentiality remains in effect until the information no longer qualifies as a trade secret; and (iii) excludes information that is publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the employee. (Br. Supp. 14–15.)

33. Defendant further argues that because the elements of Plaintiff's restaurant allegedly copied by Defendant—including its "menu, drinks, decorations, glassware, dishes, dish presentations, dish names, aesthetics, [and] look and feel"— are publicly disclosed, such elements are not information that Defendant is obligated to keep confidential under the Employment Agreement. (Br. Supp. 15.)

34. As an initial matter, the Court notes that the Employment Agreement provides a definition of "confidential information" beyond a mere recitation of the statutory definition of trade secrets. While the definition of "confidential information" includes "ideas, inventions, works of authorship, technical manuals,

training materials, restaurant concepts, designs and aesthetics, computer software and programs or *any other information, however documented, that is a trade secret or proprietary information within the meaning of applicable law, including N.C.G.S. § 66-152*[,]" the definition also includes numerous other items that are considered confidential by the agreement but which may not meet the statutory definition of a trade secret. (Agmt. § 3 (emphasis added).)

35. Upon review of the allegations in the *Amended Complaint*, the Court determines that, at this stage, Plaintiff has sufficiently pled a claim for breach of contract. Specifically, Plaintiff has alleged that the Employment Agreement is a valid, enforceable agreement between Plaintiff and Defendant and that Defendant breached that agreement by disclosing to Habaneros certain confidential information. (Am. Compl. ¶¶ 26–27.)

36. Therefore, the Court hereby **DENIES** the Motion as to Count One for breach of the Employment Agreement.

## B. Count Two: Misappropriation of Trade Secrets

37. Plaintiff alleges that "[Defendant] possesses, was trained in, and utilized the confidential, proprietary, market-sensitive and unique information of [Plaintiff] in the changes he implemented at Habaneros[.]" (Am. Compl. ¶ 31.) Specifically, Plaintiff alleges that Defendant has misappropriated the following:

      a. recipes, ingredients, and unique preparations;

      b. unique food and drink presentations;

      c. business plans;

      d. supplier relationships;

    e.    menus;

    f.    pricing;

    g.    documents and records; and

    h.    employment practices, policies, and payroll information.

(Am. Compl. ¶ 31.)

38.    Plaintiff alleges that "[t]his information constitutes trade secrets as defined by the North Carolina Trade Secrets Act in that they derive independent economic value from not being generally known to and not being readily ascertainable by [Plaintiff's] competitors or the public generally."  (Am. Compl. ¶ 32.)  Further, Plaintiff alleges that it takes precautions to maintain the confidentiality of the alleged trade secrets by limiting access to "need to know" employees, using employment agreements that contain confidentiality and non-disclosure covenants, and requiring employees to agree to and comply with personnel policies that address the security and confidentiality of Plaintiff's trade secrets.  (Am. Compl. ¶ 33.)

39.    As to the alleged misappropriation by Defendant, Plaintiff alleges that Defendant "has provided to Habaneros, or will inevitably and imminently provide, [Plaintiff's] Confidential Information and trade secrets to Aqui Mero[.]"  (Am. Compl. ¶ 35.)

40.    Defendant argues that the trade secret misappropriation claim fails because (i) the alleged misappropriation occurred in Missouri and, therefore, North Carolina law does not apply; and (ii) notwithstanding the choice-of-law issue, Plaintiff has not identified its trade secrets or Defendant's alleged acts of

misappropriation with sufficient particularity.  (Br. Supp. 5.)  The Court will address each argument in turn.

### 1. Choice of Law

41.  In determining the applicable substantive law for a trade secret misappropriation claim, North Carolina courts use the *lex loci delicti* test.  *See e.g.*, *SciGrip, Inc. v. Osae*, 373 N.C. 409, 420–21 (2020).  Under this test, "the substantive law of the state where the injury or harm was sustained or suffered, which is, ordinarily, the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place, applies."  *Id.* at 420 (citation modified).

42.  Defendant contends that because Plaintiff only alleges that he misappropriated trade secrets in Missouri by incorporating them at Habaneros, Plaintiff has failed to state a claim under the North Carolina Trade Secrets Protection Act (NCTSPA).  (Br. Supp. 6–7.)  Defendant argues that he "might have learned [Plaintiff's] information in North Carolina, but the last act necessary to make him liable—the actual misappropriation, *i.e.*, unauthorized use of [Plaintiff's] trade secrets—supposedly occurred when [Defendant] worked for Habaneros in Missouri." (Br. Supp. 6.)

43.  Plaintiff argues in response that the choice-of-law determination is appropriate only after discovery, once sufficient facts exist to establish where the alleged misappropriation occurred.  (Pl.'s Br. Opp'n Mot. 5, ECF No. 23 [Br. Opp'n].) Additionally, Plaintiff contends that at present, "[t]he gaps in the factual record leave

open the clear probability that misappropriation occurred, at least in part, in North Carolina[,]" and that "it remains unclear how or when Defendant began using [Plaintiff's] proprietary information—including whether he leveraged such information while still employed and residing in North Carolina to secure his subsequent business venture, to establish relationships, or to otherwise prepare to replicate a Mezcalito restaurant." (Br. Opp'n 6.)

44.   As an initial matter, the Court notes that a choice-of-law issue may be determined at the motion to dismiss stage, particularly where there are no allegations in the relevant pleading that support an inference that the last act giving rise to the injury occurred anywhere other than outside North Carolina. *See Elior, Inc. v. Thomas*, 2024 NCBC LEXIS 61, at \*43–44 (N.C. Super. Ct. Apr. 22, 2024); *Env't Holdings Grp., LLC v. Finch*, 2022 NCBC LEXIS 45, at \*12–13 (N.C. Super. Ct. May 16, 2022) (determining at the 12(b)(6) stage that Virginia law applied to a trade secret misappropriation claim where complaint alleged no actions taken by the defendant in North Carolina other than reporting to his supervisor in a Raleigh office).

45.   Upon review of the *Amended Complaint*, the substance of the allegations is that Defendant misappropriated the alleged trade secrets by disclosing them to Habaneros and using them in implementing changes at Habaneros that, in essence, replicated Plaintiff's restaurant. (*See* Am. Compl. ¶¶ 20, 22.) Despite Plaintiff's contention that Defendant may have misappropriated the alleged trade secrets while still in North Carolina, the Court determines that the *Amended Complaint* is devoid

of any allegation, even upon information and belief, that any misappropriation occurred prior to Defendant's relocation to Missouri and alleged misappropriation there.

46. Accordingly, the Court concludes that Missouri law governs the trade secret misappropriation claim, as the facts expressly alleged by Plaintiff in the *Amended Complaint* permit no inference other than that the last act necessary to impose liability occurred in Missouri. Given that Plaintiff has brought Count Two exclusively under the NCTSPA and has pled no additional or alternative claim for misappropriation under Missouri law, the Court concludes that Count Two must be dismissed based on choice-of-law.

## 2. Identification of Trade Secrets

47. Even assuming *arguendo* that North Carolina law applies, the Court concludes that Plaintiff has failed to plead the alleged trade secrets with sufficient particularity, as required under the NCTSPA.

48. The North Carolina Trade Secrets Protection Act defines a trade secret as:

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> > a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3). "To plead misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec*, 370 N.C. at 609 (citation omitted).

49. At the Hearing, Plaintiff's counsel conceded that neither menus nor unique food and drink presentations can constitute trade secrets, as these items are in the public view and, at least with respect to unique food and drink presentations, would more properly be considered trade dress, a cause of action not asserted in the *Amended Complaint*. The Court agrees and concludes that Plaintiff cannot maintain a claim for trade secret misappropriation as to menus or unique food and drink presentations.

50. As for the remaining alleged trade secrets, the Court concludes that Plaintiff has failed to identify any trade secret with sufficient particularity. While these items—including (i) recipes, ingredients, and unique preparations, (ii) business plans, (iii) supplier relationships, (iv) pricing, (v) documents and records, and (vi) employment practices, policies, and payroll information—may conceivably include information that properly qualifies as a trade secret under the NCTSPA, such categories of information, with no further reasoning, detail, or information, are not sufficiently particular to serve as a basis for a trade secret misappropriation claim in North Carolina. *See Krawiec*, 370 N.C. at 611–12 (determining that a description of

trade secrets as "original ideas and concepts for dance productions" and "marketing strategies and tactics" was insufficiently particular); *Design Gaps, Inc. v. Hall*, 2024 NCBC LEXIS 64, at *9 (N.C. Super. Ct. May 1, 2024) (dismissing trade secret misappropriation claim for lack of particularity where complaint included no further detail about the "customer lists, formulas, plans, materials, methods, information, roadmaps, and strategies" alleged to be trade secrets).

### 3. Allegations of Misappropriation

51. Moreover, the Court determines that Plaintiff has not sufficiently pled with specificity the acts by which Defendant allegedly misappropriated any trade secrets.

52. Misappropriation is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1). The allegations of a complaint must identify with specificity "the acts by which the alleged misappropriations were accomplished." *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 327 (2008).

53. Beyond the broad assertion that Defendant used Plaintiff's trade secrets in creating a substantially similar restaurant for Habaneros, the Complaint offers no additional specificity regarding how Defendant did so.

54. Further, North Carolina courts do not recognize the doctrine of inevitable disclosure, nor does the NCTSPA provide for the same. *See, e.g., Se. Anesthesiology Consultants, PLLC v. Charlotte-Mecklenburg Hosp. Auth.*, 2018 NCBC LEXIS 137,

at *57–58 (N.C. Super. Ct. June 22, 2018). Throughout the *Amended Complaint*, Plaintiff uses the conjunction "or" to describe the alleged misappropriation. (*See, e.g.*, Am. Compl. ¶ 36 (alleging Defendant "has used or disclosed *or* will inevitably use or disclose these trade secrets" (emphasis added)).) Therefore, to the extent Plaintiff's claim for trade secret misappropriation is based on the allegation that Defendant will inevitably use or disclose Plaintiff's trade secrets, Count Two fails as a matter of law for this additional reason.

55. For the reasons set forth herein, the Court determines that Plaintiff has failed to state a claim for misappropriation of trade secrets under the NCTSPA. Therefore, the Court **GRANTS** the Motion as to Count Two for misappropriation of trade secrets, and Count Two is dismissed with prejudice to the limited extent it is based on the alleged misappropriation of Plaintiff's menus and unique food and drink presentations, as those items do not constitute trade secrets. Count Two is otherwise dismissed without prejudice as it relates to the remaining alleged trade secrets identified in paragraph 31 of the *Amended Complaint*.[2]

C. **Count Three: Unfair and Deceptive Trade Practices and Common Law Unfair Competition**

56. Plaintiff alleges that Defendant's actions, "including [Defendant's] misappropriation and disclosure of trade secrets, and other intentional and willful actions" described in the *Amended Complaint*, constitute unfair and deceptive acts and practices and unfair methods of competition. (Am. Compl. ¶ 44.)

---

[2] This partial dismissal without prejudice assumes Plaintiff can otherwise sufficiently plead facts supporting the application of North Carolina law, which the Court determines it has not done in the *Amended Complaint*.

57.     "To prevail on a claim of unfair and deceptive trade practice a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing, Inc. of N.C. v. Pollard*, 101 N.C. App. 450, 460–61 (1991) (citing *Marshall v. Miller*, 302 N.C. 539 (1981)).

58.     Chapter 75 of the North Carolina General Statutes (UDTPA) provides, in pertinent part, that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75-1.1(a).   Further, the UDTPA defines "commerce" to include "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession."  N.C.G.S. § 75-1.1(b).

59.     "North Carolina courts have previously concluded that when the UDTP[A] claim rests solely upon other claims . . . which the court determines should be dismissed, the UDTP[A] claim must fail as well." *Charah, LLC v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 52, at \*19 (N.C. Super. Ct. Apr. 17, 2020).

60.     Moreover, when the UDTPA claim is premised on a breach of contract, the plaintiff must allege substantial aggravating circumstances sufficient to support the UDTPA claim.  *See SciGrip*, 373 N.C. at 426–27 (concluding that "an intentional breach of contract, standing alone, simply does not suffice to support the assertion of [a UDTPA] claim").

61.     "Traditionally at common law, including that of North Carolina, the tort of unfair competition consisted of acts or practices by a competitor which are likely to

deceive the consuming public." *Stearns v. Genrad, Inc.*, 564 F. Supp. 1309, 1320 (M.D.N.C. 1983), *aff'd*, 752 F.2d 942 (4th Cir. 1984) (citation omitted). "The gravamen of unfair competition is the protection of a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money." *Henderson v. U.S. Fid. & Guar. Co.*, 346 N.C. 741, 749 (1997) (citations omitted). "Unfair competition has been found to encompass a range of behaviors 'such as trademark infringement, imitation of a competitor's product or its appearance, interference with a competitor's contractual relations, [and] disparagement of a competitor's product or business methods, and misappropriation of a competitor's intangible property rights such as advertising devices or business systems.'" *Gateway Mgmt. Servs. v. Carrbridge Berkshire Grp., Inc.*, 2018 NCBC LEXIS 45, at \*19–20 (N.C. Super. Ct. May 9, 2018) (quoting *Stearns*, 564 F. Supp. at 1320).

62. "Courts have recognized that a claim for common law unfair competition is analyzed the same way as a claim for unfair or deceptive trade practices under [N.C.]G.S. § 75-1.1." *Cnty. of Wake PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at \*26 (N.C. Super. Ct. Sep. 9, 2020) (citations omitted); *see also Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 104, at \*23 (N.C. Super. Ct. Oct. 9, 2018) ("The standard which a plaintiff must meet to recover on an unfair competition claim under the common law is not appreciably different from a claim for unfair or deceptive trade practices." (citation modified) (quoting *BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 615 (M.D.N.C. 1999))).

63. As the Court has concluded that Plaintiff's allegations are insufficient to state a claim for misappropriation of trade secrets, the Court likewise determines that Plaintiff's allegations are insufficient to state a UDTPA or common law unfair competition claim based on that same conduct. Further, to the extent that Count Three is premised on Defendant's alleged breach of contract as asserted in Count One, the Court concludes that the *Amended Complaint* is devoid of allegations amounting to "substantial aggravating circumstances" necessary to sustain a UDTPA claim on the basis of an alleged breach of contract. *See SciGrip*, 373 N.C. at 427.

64. Therefore, the Court **GRANTS** the Motion as to Count Three. With respect to the alleged misappropriation of menus and unique food and drink presentations, Count Three for unfair and deceptive trade practices and common law unfair competition is dismissed with prejudice, as the Court concludes these items do not constitute trade secrets under North Carolina law. To the extent Count Three is based on the alleged misappropriation by Defendant of other purported trade secrets and/or a breach by Defendant of the Employment Agreement, Count Three is dismissed without prejudice.

**D.    Count Four: Preliminary and Permanent Injunction**

65. Plaintiff purports to bring Count Four for preliminary and permanent injunction, seeking a Court order

> enjoining [Defendant] from further actual or threated misappropriation of [Plaintiff's] trade secrets, clearly terminating his participation in [Plaintiff's] profit-sharing program, imposing a constructive trust over all personal property, assets and tangible things of value in the care, custody or control of [Defendant] in order to prevent fraudulent transfers and/or voidable transactions that could impair [Plaintiff's]

ability to obtain monetary satisfaction of any judgment in this action, and otherwise maintaining the *status quo* to prevent possible irreparable harm during the pendency of this action.

(Am. Compl. ¶ 56.)

66. Injunctive relief "is an ancillary remedy, not an independent cause of action." *Revelle v. Chamblee*, 168 N.C. App. 227, 230 (2005) (citation omitted). It is well-settled that "injunctive relief is not a standalone claim[.]" *Window World of St. Louis, Inc. v. Window World, Inc.*, 2021 NCBC LEXIS 88, at *15 (N.C. Super. Ct. Oct. 6, 2021).

67. Moreover, the Court notes that to properly pursue injunctive relief in this Court by motion, the moving party must file a separate document in the form of a motion along with a separately filed supporting brief. *See* BCR 7.2.

68. Accordingly, the Court hereby **GRANTS** the Motion as to Count Four, and Count Four for preliminary and permanent injunctive relief is dismissed without prejudice to Plaintiff's ability to seek this remedy at a later time through proper procedures if warranted by the relevant facts and law.

## VI. CONCLUSION

69. For the foregoing reasons, the Court hereby **GRANTS** in part and **DENIES** in part the Motion as follows:

> a. The Court **GRANTS** the Motion as to Count Two for misappropriation of trade secrets to the extent it is based on an alleged misappropriation of unique food and drink presentations and menus, and Count Two is **DISMISSED** with prejudice to that limited extent;

b.    The Court **GRANTS** the Motion as to Count Two for misappropriation of trade secrets with respect to all other alleged misappropriations, and Count Two is **DISMISSED** without prejudice to that limited extent;

c.    The Court **GRANTS** the Motion as to Count Three for violation of the UDTPA and common law unfair competition, and that claim is **DISMISSED** with prejudice to the extent it is premised on an alleged misappropriation of menus and unique food and drink presentations and without prejudice to the extent it is based on all other alleged misappropriations of trade secrets and/or Defendant's alleged breach of the Employment Agreement;

d.    The Court **GRANTS** the Motion as to Count Four for preliminary and permanent injunction, and that claim is **DISMISSED** without prejudice; and

e.    Except as herein granted, the Motion is hereby **DENIED**.

**IT IS SO ORDERED**, this the 17th day of February, 2026.

/s/ Michael L. Robinson
Michael L. Robinson
Chief Business Court Judge